**Michael E. MOSS, Plaintiff-Appellant,**

v.

**MORGAN STANLEY INC., E. Jacques Courtois, Jr., Adrian Antoniu, and James M. Newman, Defendants,**

**Morgan Stanley Inc. and James M. Newman, Defendants-Appellees.**

No. 1281, Docket 83–7120.

United States Court of Appeals, Second Circuit.

Argued May 19, 1983.

Decided Sept. 9, 1983.

---

Richard J. Kilsheimer, New York City (Robert N. Kaplan, Kaplan, Kilsheimer & Foley, New York City, Herbert E. Milstein, Steven J. Toll, Kohn, Milstein, Cohen & Hausfeld, Washington, D.C., of counsel), for plaintiff-appellant.

Arthur F. Mathews, Washington, D.C. (Andrew B. Weissman, Thomas W. White, Wilmer, Cutler & Pickering, Washington, D.C., of counsel), for defendant-appellee James M. Newman.

Henry L. King, New York City (Arthur F. Golden, James L. Kerr, Davis Polk & Wardwell, New York City, of counsel), for defendant-appellee Morgan Stanley Inc.

Daniel L. Goelzer, Gen. Counsel, Jacob H. Stillman, Associate Gen. Counsel, Rosalind C. Cohen, Asst. Gen. Counsel, Paul Gonson, Sol., Robert Mills, Elliot M. Pinta, S.E.C., Washington, D.C., amicus curiae.

Before MANSFIELD, MESKILL and KEARSE, Circuit Judges.

MESKILL, Circuit Judge:

This appeal spotlights two issues of significance for the litigation of federal securities fraud claims: (1) whether a shareholder who unwittingly sold stock of a "target" company on the open market prior to public announcement of a tender offer has a cause of action for damages under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1976) (the 1934 Act), and rule 10b–5, 17 C.F.R. § 240.10b–5 (1982) promulgated thereunder against a person who purchased "target" shares on the basis of material nonpublic information which he acquired from the tender offeror's investment adviser; and (2) whether this same unwitting shareholder can recover treble damages under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq. (1976 & Supp. III 1979) (RICO), on the ground that he was injured by an unlawful "enterprise" conducting a "pattern of racketeering activity" comprised of "fraudulent" securities transactions.

The district court held that the shareholder failed to state a cause of action under both the 1934 Act and RICO. We agree for the reasons stated below.

Affirmed.

## BACKGROUND

The chain of events that culminated in this action began in the latter months of 1976 with tender offer discussions between Warner-Lambert Company (Warner) and Deseret Pharmaceutical Company (Deseret). On November 23, 1976 Warner retained the investment banking firm of Morgan Stanley & Co. Incorporated, a subsidiary of Morgan Stanley Inc. (Morgan Stanley), to assess the desirability of acquiring Deseret, to evaluate Deseret's stock and to recommend an appropriate price per share for the tender offer.

One of the individual defendants in this action, E. Jacques Courtois, Jr., was then employed by Morgan Stanley in its mergers and acquisitions department. In that capacity Courtois acquired knowledge of Warner's plan to purchase Deseret stock. On November 30, 1976 Courtois informed defendant Adrian Antoniu, an employee of Kuhn Loeb & Co., of the proposed tender offer and urged him to purchase Deseret stock. Antoniu in turn informed James M. Newman, a stockbroker, that Warner intended to bid for Deseret. Pursuant to an agreement with Antoniu and Courtois, Newman purchased 11,700 shares of Deseret stock at approximately $28 per share for his and their accounts. Newman also advised certain of his clients to buy Deseret stock.

Trading was active in Deseret shares on November 30, 1976, with approximately 143,000 shares changing hands. Michael E. Moss, the plaintiff in this action, was among the active traders, having sold 5,000 shares at $28 per share. On the following day, December 1, 1976, the New York Stock Exchange halted trading in Deseret stock pending announcement of the tender offer. Trading remained suspended until December 7, 1976 when Warner publicly announced its tender offer for Deseret stock at $38 per share. Newman and the other defendants tendered their shares to Warner and reaped a substantial profit.

On August 5, 1982 Moss commenced this action on his own behalf and on behalf of the class of investors who sold stock in Deseret on November 30, 1976.[1] He contended that "members of the class have been substantially damaged in that they sold Deseret stock prior to the public announcement of the Warner tender offer at prices substantially below [those] offered by Warner." J.App. at 11. The amended complaint stated three causes of action: (1) Moss sought to recover damages from Newman for allegedly violating section 10(b) of the 1934 Act and rule 10b–5 thereunder by purchasing Deseret shares with knowledge of the imminent tender offer and without disclosing such information to Deseret

---

1. The parties agreed to delay consideration of class certification until 30 days following the district court's disposition of defendants' 12(b)(6) motions. *Moss v. Morgan Stanley Inc.*, 82 Civ. 5182 (S.D.N.Y. Dec. 16, 1982) (stipulation and order).

shareholders;[2] (2) Moss sought to recover damages from Morgan Stanley on the ground that as a "controlling person" under section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a) (1976), Morgan Stanley should be derivatively liable for Courtois' wrongdoing;[3] and (3) pursuant to RICO, 18 U.S.C. § 1964(c) (1976), Moss sought to recover treble damages from Newman on the ground that he engaged in "at least two acts of fraud in connection with the purchase and sale of securities and as such [his actions represented] a pattern of racketeering activity within the meaning of RICO."[4] J.App. at 11.

In September 1982 Newman moved pursuant to Fed.R.Civ.P, 12(b)(6) to dismiss the complaint for failure to state a claim upon which relief could be granted. Shortly thereafter, defendant Morgan Stanley filed a rule 12(b)(6) motion to dismiss, alternatively styled as a Fed.R.Civ.P. 56 motion for summary judgment, and also requested attorneys' fees and costs pursuant to Fed.R.Civ.P. 11. The United States District Court for the Southern District of New York, Pollack, *J.,* granted both defendants' motions to dismiss, defendant Morgan Stanley's Rule 56 motion[5] and awarded costs to both defendants. *Moss v. Morgan Stanley Inc.,* 553 F.Supp. 1347, 1352 (S.D.N.Y.1983). Although we disagree with several of the reasons advanced by the district court for dismissing plaintiff's RICO claim, we affirm the judgment dismissing the complaint and awarding costs to both defendants.[6]

2. In Count 1 of the amended complaint, Moss alleged that Courtois and Antoniu, as well as Newman, violated section 10(b) and rule 10b–5. Moss also alleged that all three individual defendants violated section 14(e) of the 1934 Act, 15 U.S.C. § 78n(e) (1976), and rule 14e–3, 17 C.F.R. § 240.14e–3 (1982). Judge Pollack found that the section 14(e) claim was without merit and plaintiff has not challenged this finding. Judge Pollack also dismissed the section 10(b) claim against all defendants and plaintiff has appealed only from the dismissal of this claim against Newman.

3. Count 1 also alleged that Morgan Stanley was jointly and severally liable to appellant for aiding and abetting the primary violations. The district court dismissed this portion of Count 1 as well as the "controlling person" claim under section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a) (1976). Plaintiff appeals only from the dismissal of the "controlling person" claim.

4. Count 2 also alleged that Morgan Stanley violated RICO. Judge Pollack dismissed the RICO claims against all defendants, but plaintiff appeals only from the dismissal of the claim against Newman.

In Count 3 of the complaint, plaintiff alleged that all of defendants' unlawful acts "constitute[d] violations of the applicable principles of common law fraud" and that defendant Morgan Stanley was "liable under the doctrine of *respondeat superior.*" J.App. at 12. The district court dismissed this count and plaintiff has not appealed.

5. On September 21, 1982 the parties met with the district court at a pretrial conference and Morgan Stanley indicated its intention to file a motion for summary judgment. Judge Pollack specifically stated that before the hearing on this motion "the plaintiff would be afforded whatever discovery plaintiff deemed necessary to defend the amended complaint." 553 F.Supp. at 1364. Morgan Stanley provided plaintiff with extensive document discovery and repeatedly asked plaintiff to designate any witnesses for deposition. *Id.* Plaintiff did not designate anyone for deposition. Judge Pollack regarded plaintiff's lack of initiative as providing:

> fair inference in the circumstances on the basis of the affidavits submitted by Morgan Stanley and their challenging effect and the background of this case that discovery would demonstrate cogently the absence rather than the presence of genuine issues of material fact on either the securities claim or the RICO claim.

*Id.* Finding that plaintiff had failed to carry his burden, Judge Pollack granted Morgan Stanley's summary judgment motion. *Id.; see Beal v. Lindsay,* 468 F.2d 287, 291 (2d Cir.1972).

Plaintiff appeals only from the district court's grant of summary judgment dismissing plaintiff's section 20(a) "derivative liability" claim. 15 U.S.C. § 78t(a) (1976).

6. Prior to this civil suit, on February 3, 1981, a 27 count criminal indictment charged Courtois and Newman with committing a series of criminal violations of § 10(b) and rule 10b–5 (including trading on the Deseret tender offer information), as well as violations of the federal mail fraud and conspiracy statutes. *United States v. Courtois,* 81 Cr. 53 (S.D.N.Y. filed Feb. 3, 1981), *as superseded,* 82 Cr. 0166 (S.D.N.Y. filed March 1, 1982). Newman was convicted on seven counts of securities fraud, seven counts of mail fraud and one count of conspiracy. He received a one year jail sentence and a fine of $10,000. *United States v. Newman,* 722

## DISCUSSION

### I. *Section 10(b) Liability* [7]

#### A. *Introduction*

██ It is well settled that traditional corporate "insiders"—directors, officers and persons who have access to confidential corporate information [8] — must preserve the confidentiality of nonpublic information that belongs to and emanates from the corporation.[9] Consistent with this duty, the owners. 15 U.S.C. § 78p (1976). However, there is no definitive test for defining an "insider." 3 A. Bromberg, Securities Law, § 7.4(6)(b) at 180–81 & n. 169.1 (1969). This Court's initial characterization of an "insider" reaffirmed the SEC's view that anyone who has access to the issuer of stock and thereby obtains nonpublic information is an "insider" for purposes of the federal securities laws:

> The essence of the Rule is that anyone who, trading for his own account in the securities of a corporation has "access, directly or indirectly, to information intended to be available only for a corporate purpose and not for the personal benefit of anyone" may not take "advantage of such information knowing it is unavailable to those with whom he is dealing," i.e., the investing public.

*SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 848 (2d Cir.1968) (en banc), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971) (quoting *In re Cady, Roberts & Co.,* 40 S.E.C. 907, 912 (1961)). Ordinarily, "insiders" include such corporate figures as directors and vice presidents, persons who have access to confidential corporate information and therefore owe a duty to a corporation's shareholders not to trade on that information. *See Dirks v. SEC,* 681 F.2d 824, 835 (D.C.Cir.1982), *rev'd on other grounds,* —— U.S. ——, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983); *O'Connor & Assoc. v. Dean Witter Reynolds, Inc.,* 529 F.Supp. 1179, 1184–85 (S.D.N.Y.1981); Langevoort, *Insider Trading and the Fiduciary Principle: A Post-Chiarella* Restatement, *70 Calif.L.Rev. 1, 19–24 (1982).*

---

F.2d 729 (2d Cir.1983) (unpublished order affirming conviction), *for cert. denied,* —— U.S. ——, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983).

Antoniu cooperated with the government and pled guilty to an Information based on his role in the securities scheme. He was sentenced to a three month term of imprisonment. Courtois, who was indicted with Newman, remains a fugitive from justice.

**7.** Section 10(b) of the 1934 Act provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> . . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (1976).

Rule 10b–5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1982). The duty either to disclose or refrain is traditionally based on subsection (c) of rule 10b–5. However, the courts have never treated the subsections of rule 10b–5 as carrying different legal consequences. *See List v. Fashion Park, Inc.,* 340 F.2d 457, 462 (2d Cir.), *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).

**8.** Section 16(b) of the 1934 Act defines "insiders" as directors, officers and 10% beneficial

**9.** In addition to distinguishing between "insiders" and "outsiders" with respect to the "duty of disclosure" under section 10(b) and rule 10b–5, the courts and commentators have also distinguished between "inside" and "outside" information. "Inside" information generally concerns the internal business affairs of the issuer—assets and earning power. "Outside" or "market" information is "related solely to the market for the securities rather than their intrinsic value." *Dirks v. SEC,* 681 F.2d 824, 834 (D.C.Cir.1982), *rev'd on other grounds* —— U.S. ——, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983).

In *Dirks v. SEC,* the D.C. Circuit discussed the importance of the "character" of information in determining whether non-disclosure of such information violates section 10(b) of the 1934 Act:

"insider" must either disclose nonpublic corporate information or abstain from trading in the securities of that corporation. *See SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 848 (2d Cir.1968) (en banc), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971); *accord Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876, 890 (2d Cir.1972) ("The essential purpose of Rule 10b–5 . . . is to prevent corporate insiders and their tippees from taking unfair advantage of the uninformed outsiders."). The individual defendants in this case—Courtois, Antoniu and Newman—having acquired confidential information through Warner's investment adviser and having no direct relationship with Deseret, could not be traditional corporate "insiders."

However, in a number of decisions the Supreme Court has extended the "duty of disclosure" requirement to nontraditional "insiders"—persons who have no special access to corporate information but who do have a special relationship of "trust" and "confidentiality" with the issuer or seller of the securities. *See, e.g., Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct.

1456, 31 L.Ed.2d 741 (1972) (bank employees who purchased shares in a tribal trust fund from mixed-blood Ute Indians without disclosing that there was a secondary market for shares at higher prices among non-Indians); *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963) (investment adviser who purchased stock for his own account just before publishing a recommendation that his clients buy the stock); *see also Zweig v. Hearst Corp.,* 594 F.2d 1261 (9th Cir.1979) (financial columnist); *Lewelling v. First California Co.,* 564 F.2d 1277 (9th Cir.1977); *Frigitemp Corp. v. Financial Dynamics Fund, Inc.,* 524 F.2d 275 (2d Cir.1975); *Flynn v. Bass Brothers Enterprises,* 456 F.Supp. 484 (E.D.Pa.1978). Moss sought to include the defendants in this category of nontraditional "insiders" and argued that they necessarily violated section 10(b) and rule 10b–5 by purchasing Deseret stock without publicly disclosing their knowledge of the impending tender offer. After finding that none of the defendants occupied a position of "trust" with respect to Moss, the

On the one hand, some of the language in the cases finds the element of unfairness and fraud in conflicts of interest on the part of traders or their informants who profit at the expense or to the exclusion of those who have placed trust in them. The conflict of interest may arise from a traditional fiduciary relationship, as between a corporate director and the corporation's shareholders, or a similar relationship of trust, as between employers and employees or investment bankers and their clients. *On the other hand, some of the cases imply that the securities laws impose a duty to disclose or refrain from trading based on the nature of the undisclosed information.* The theory is that all investors should have equal access to information that a reasonable investor would consider material to investment decisions, and that any trade in which only one party had an opportunity to learn and did learn such information is inherently unfair.

*Id.* at 835 (emphasis added) (footnotes omitted). The "[t]ension between the two theories derives in large part from the conflict between the two major ideals of the federal securities laws: fairness to all investors and efficient markets for capital." *Id.* at 835 n. 14; *see* Brudney, *Insiders, Outsiders, and Informational Advantages Under the Federal Securities Laws,* 93 Harv.L.Rev. 322, 333–39 (1979).

This "information" theory of section 10(b) liability has been rejected by some commentators:

The same information can therefore be either inside or outside information. A market researcher or columnist who concludes from published information that a certain company is ripe for a takeover bid, the person making the tender offer, an employee of the tender offeror who misuses the information, and even a stock market specialist or broker who observes preparations for the tender offer, all use outside market information when they trade in target securities. By contrast, the target executive who learns of the impending offer by virtue of his employment uses inside market information when he trades in target stock. *The important factor is not the type of information, so long as it is material, but its source.*

Barry, *The Economics of Outside Information and Rule 10b–5,* 129 U.Pa.L.Rev. 1307, 1309–10 n. 11 (1981) (emphasis added), and most recently the Supreme Court has laid the issue to rest: "Judge Wright correctly read our opinion in *Chiarella* as repudiating any notion that all traders must enjoy equal information before trading: '[T]he "information" theory is rejected.' " *Dirks v. SEC,* —— U.S. ——, ——, 103 S.Ct. 3255, 3262, 77 L.Ed.2d 911 (1983).

district court held that none of the defendants owed him such a "duty of disclosure." In light of the Supreme Court's decisions in *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), and *Dirks v. SEC,* —— U.S. ——, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983), which recently articulated the standard for analyzing violations of section 10(b) and rule 10b–5, we agree with the district court's dismissal of plaintiff's federal securities law claim.

### B. *Chiarella v. United States*

In *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), an employee of a New York financial printer deduced the identity of corporate takeover targets from the confidential offering documents prepared by his firm. Without disclosing his knowledge of the acquiring company's plans, Chiarella purchased stock in the target companies and sold it at ·a substantial profit immediately after public announcement of the takeovers. *Id.* at 224, 100 S.Ct. at 1112. He was indicted and convicted of violating section 10(b) of the 1934 Act and rule 10b–5. A divided Court of Appeals affirmed the conviction. *United States v. Chiarella,* 588 F.2d 1358 (2d Cir. 1978) (Meskill, J., dissenting).

The Supreme Court reversed, stating that:

> In this case, the petitioner was convicted·of violating § 10(b) although he was not a corporate insider and he received no confidential information from the target company. Moreover, the "market information" upon which he relied did not concern the earning power or operations of the target company, but only the plans of the acquiring company. *Petitioner's use of that information was not a fraud under § 10(b) unless he was subject to an affirmative duty to disclose it before trading.*

*Chiarella v. United States,* 445 U.S. at 231, 100 S.Ct. at 1116 (emphasis added) (footnote omitted); *see Dirks v. SEC,* —— U.S. at ——, 103 S.Ct. at 3261. The Court explained that liability for nondisclosure of material nonpublic market information un-

der section 10(b) is "premised upon a duty to disclose arising from a relationship of trust and confidence between parties to a transaction." *Id.* at 230, 100 S.Ct. at 1115. Absent an "insider" or "fiduciary" relationship with the sellers of stock, a purchaser has no duty to disclose nonpublic market information. *Id.* at 229, 100 S.Ct. at 1115 (citing with approval *General Time Corp. v. Talley Industries, Inc.,* 403 F.2d 159, 164 (2d Cir.1968), *cert. denied,* 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969) ("We know of no rule of law ... that a purchaser of stock, who was not an 'insider' and had no fiduciary relation to a prospective seller, had any obligation to reveal circumstances that might raise a seller's demands and thus abort the sale.")); *see also Polinsky v. MCA Inc.,* 680 F.2d 1286, 1290 (9th Cir.1982) ("[A] purchaser of stock who has no fiduciary relationship to the prospective seller of the stock and who owns less than five percent of the target companies' stock has no duty to disclose circumstances that will insure the purchaser pays the highest possible price for the stock."); *Staffin v. Greenberg,* 672 F.2d 1196, 1201–02 (3d Cir.1982).

The Court concluded unequivocally that Chiarella owed no duty of disclosure:

> [T]he element required to make silence fraudulent—a duty to disclose—is absent in this case. No duty could arise from petitioner's relationship with the sellers of the target company's securities, for petitioner had no prior dealings with them. He was not their agent, he was not a fiduciary, he was not a person in whom the sellers had placed their trust and confidence. He was, in fact, a complete stranger who dealt with the sellers only through impersonal market transactions.

*Chiarella v. United States,* 445 U.S. at 232–33, 100 S.Ct. at 1116–17.

### C. *Application of Chiarella*

■ In applying *Chiarella*'s "fiduciary standard" to this case, Judge Pollack concluded that Newman owed no "duty of disclosure" to plaintiff Moss and hence could not be liable for a section 10(b) or rule

10b–5 violation. 553 F.Supp. at 1352–53. We agree. Like Chiarella, both Courtois and Newman were "complete stranger[s] who dealt with the sellers [of Deseret stock] only through impersonal market transactions." *Chiarella v. United States,* 445 U.S. at 232–33, 100 S.Ct. at 1117. However, in this appeal plaintiff continues to insist, *arguendo,* that if civil "liability is premised upon a duty to disclose arising from a relationship of trust and confidence between parties to a transaction," then he occupied such a position of "trust" with respect to the defendants. He suggests three sources for the defendants' "duty of disclosure."

### 1. United States v. Newman

■ Moss first argues that because Courtois owed a "fiduciary duty" to his employer, Morgan Stanley, and to Morgan Stanley's client, Warner, then Newman (standing in Courtois' shoes) owed a separate duty of disclosure to Deseret shareholders. Plaintiff claims that our decision in *United States v. Newman,* 664 F.2d 12 (2d Cir. 1981), *aff'd after remand,* 722 F.2d 729 (2d Cir. 1983) (unpublished order), cert. denied, —— U.S. ——, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983), supports this circuitous linking of liability. We disagree.

In *Newman* we held that Courtois' and Antoniu's securities transactions constituted a breach of their fiduciary duty of confidentiality and loyalty to their employers (Morgan Stanley and Kuhn Loeb & Co., respectively) and thereby provided the basis for *criminal* prosecution under section 10(b) and rule 10b–5. Indeed, the district court at Newman's trial specifically charged the jury that "the law is clear that Mr. Newman had no obligation or duty to the people from whom he bought the stock to disclose what he had learned, and, thus, he could not have defrauded these people as a matter of law." J.App. at 29–30. Nothing in our opinion in *Newman* suggests that an employee's duty to "abstain or disclose" with respect to his employer should be stretched to encompass an employee's "duty of disclosure" to the general public. In fact, we

explicitly limited our holding in *Newman* by stating:

> In two instances the targets themselves were clients of the investment banking firms. The Government belatedly suggests that the indictment should be construed to allege securities laws violations in these two instances, on the theory that the defendants, by purchasing stock in the target companies, *defrauded the shareholders of those companies.* Whatever validity that approach might have, it is not fairly within the allegations of the indictment, which allege essentially that the defendants defrauded the investment banking firms and the firms' takeover clients.

*United States v. Newman,* 664 F.2d at 15 n. 1 (emphasis added). Thus, the district court was correct in concluding that "plaintiff cannot hope to piggyback upon the duty owed by defendants to Morgan Stanley and Warner. There is no 'duty in the air' to which any plaintiff can attach his claim." 553 F.Supp. at 1353.

### 2. "Insider" Trading

Plaintiff's next attempt to find a source for Newman's duty to disclose is to argue that Morgan Stanley and its employee Courtois were "insiders" of Deseret and therefore owed a duty to Deseret shareholders. Moss asserts that Morgan Stanley and Courtois were transformed into "insiders" upon their receipt of confidential information from Deseret during tender offer negotiations in this "friendly takeover." Such an argument fails both as a matter of fact and law.

■ First, the complaint contains no factual assertions that Morgan Stanley or Courtois received *any* information from Deseret. Nor does it allege that Newman traded on the basis of information derived from the issuer or seller of Deseret stock. Rather, the complaint was premised solely on the theory that Newman traded on the basis of information originating from "Warner's plan to acquire Deseret stock." J.App. at 9.

Yet, even if we overlook the complaint's facial deficiencies, plaintiff's theory fails as a matter of law. In *Walton v. Morgan Stanley & Co.,* 623 F.2d 796 (2d Cir.1980), we held that an investment banker, representing an acquiring company, does not owe a fiduciary duty to the target simply because it received confidential information during the course of tender offer negotiations. In *Walton,* Kennecott Copper Corporation retained Morgan Stanley to advise it about the possible acquisition of Olinkraft, Inc. In the course of negotiations, Olinkraft furnished Morgan Stanley with "inside" information which was to be kept confidential. Although Kennecott ultimately elected not to bid, Morgan Stanley purchased Olinkraft shares for its own account based on the "confidential" information. In rejecting Olinkraft's claim that Morgan Stanley violated section 10(b) by breaching a fiduciary duty owed to Olinkraft, we held that Morgan Stanley had engaged in arm's length bargaining with the target. Morgan Stanley did not become the target's fiduciary simply upon receipt of confidential information. We noted that "we have not found any [cases] that consider[ ] one in Morgan Stanley's position [investment adviser to the "shark"] to stand in a fiduciary relationship to one in Olinkraft's [the target]." *Id.* at 799; *see Dirks v. SEC,* —— U.S. ——, —— n. 22, 103 S.Ct. 3255, 3265 n. 22, 77 L.Ed.2d 911 (1983) (citing *Walton* with approval as "[a]n example of a case turning on the court's determination that the disclosure did not impose any fiduciary duties on the recipient of the inside information"); *see generally Frigitemp Corp. v. Financial Dynamics Fund, Inc.,* 524 F.2d 275, 278–79 (2d Cir.1975) (investment companies that traded on confidential information obtained in the course of negotiations for private placement of debentures owed no duty to the selling corporation).

■ Relying on *Walton,* Judge Pollack properly concluded that "unless plaintiffs can set forth facts that turn the negotiations from arm's length bargaining into a fiduciary relationship, they cannot claim that Morgan Stanley owed them a fiduciary duty." 553 F.Supp. at 1355. We recognize that with only "the complaint and the appellee's motion to dismiss, we do not have the benefit of findings of fact about whatever communication occurred between Olinkraft [Deseret], the potential target, and Morgan Stanley, the financial advisor to the potential acquirer: how the communication proceeded, what understandings were reached, what assumptions or expectations the trade's practice would justify." *Walton v. Morgan Stanley & Co.,* 623 F.2d at 798. Yet Moss' complaint is patently deficient. It is barren of any factual allegations that might establish a fiduciary relationship between Morgan Stanley and Deseret. The complaint shows only that Morgan Stanley was retained by Warner and represented Warner's interest in the tender offer negotiations with Deseret. The district court correctly found that the complaint did not allege a section 10(b) or rule 10b–5 claim premised on Morgan Stanley's "insider" status.

### 3. *Broker-Dealer Duty*

Plaintiff's final attempt to establish a cognizable duty between himself and the defendants is to argue that Newman violated rule 10b–5 because as a registered broker-dealer he owed a general duty to the market to disclose material nonpublic information prior to trading. Moss relies on the District of Columbia Circuit's decision in *Dirks v. SEC,* 681 F.2d 824 (D.C.Cir.1982), *rev'd on other grounds* —— U.S. ——, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983), to support his argument. Such reliance is misplaced. In *Dirks,* the SEC censured a broker-dealer for tipping his clients about irregularities at Equity Funding Corporation of America before he publicly disclosed evidence of corporate fraud. The Circuit Court did not consider whether a broker-dealer's nondisclosure of nonpublic information gives rise to civil liability under section 10(b) or rule 10b–5. In fact, the D.C. Circuit made clear that a "private action for damages might raise questions of standing, causation, and appropriate remedy not pertinent [in *Dirks* ]." 681 F.2d at 839–40 n. 19. Moreover, in the Supreme Court's recent reversal

of *Dirks,* the Court expressly declined to consider Judge Wright's "novel theory" that "Dirks acquired a fiduciary duty by virtue of his position as an employee of a broker-dealer." —— U.S. at —— n. 26, 103 S.Ct. at 3267 n. 26. Therefore, neither the D.C. Circuit's nor the Supreme Court's decision in *Dirks* lends any support to the plaintiff's argument.

■ We find nothing in the language or legislative history of section 10(b) or rule 10b–5 to suggest that Congress intended to impose a *special duty of disclosure* on broker-dealers simply by virtue of their status as market professionals. *Cf. Dirks v. SEC,* 681 F.2d at 840, 841 & n. 21 (Judge Wright reads the legislative history of the 1934 Act as providing that "securities professionals regulated by the Act would owe certain responsibilities to the public at large as well as to their clients."). Indeed, to impose such a duty "could have an inhibiting influence on the role of market analysts, which the SEC itself recognizes is necessary to the preservation of a healthy market." *Dirks v. SEC,* —— U.S. at —— & n. 17, 103 S.Ct. at 3263 & n. 17.

Moreover, in *Dirks v. SEC,* —— U.S. ——, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983), the Supreme Court expressly reaffirmed its holding in *Chiarella* that " '[a] duty [to disclose] arises from the relationship between parties . . . and not merely from one's ability to acquire information because of his position in the market.' " *Id.* at ——, 103 S.Ct. at 3263 (quoting *United States v. Chiarella,* 445 U.S. at 232–33 & n. 14, 100 S.Ct. at 1116 & n. 14). The Court reexamined this "duty of disclosure:"

> Under certain circumstances, such as where corporate information is revealed legitimately to an underwriter, accountant, lawyer, or *consultant working for the corporation* [Deseret's advisers], these outsiders may become fiduciaries of the shareholders. The basis for recognizing this fiduciary duty is not simply that such persons acquired nonpublic corporate information, but rather that they have entered into a special confidential relationship in the conduct of the business of the

> enterprise and are given access to information solely for corporate purposes. *See SEC v. Monarch Fund,* 608 F.2d 938, 942 (CA2 1979); *In re Investors Management Co.,* 44 S.E.C. 633, 645 (1971); *In re Van Alstyne, Noel & Co.,* 43 S.E.C. 1080, 1084–1085 (1969); *In re Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 43 S.E.C. 933, 937 (1968); *Cady, Roberts,* 40 S.E.C., at 912. . . . *For such a duty to be imposed, however, the corporation must expect the outsider to keep the disclosed nonpublic information confidential, and the relationship at least must imply such a duty.*

*Id.* —— U.S. at —— n. 14, 103 S.Ct. at 3261 n. 14 (emphasis added).

The defendants in this case—Courtois and his tippees Antoniu and Newman—owed no duty of disclosure to Moss. In working for Morgan Stanley, neither Courtois nor Newman was a traditional "corporate insider," and neither had received any confidential information from the target Deseret. Instead, like Chiarella and Dirks, the defendants were "complete stranger[s] who dealt with the sellers [of Deseret stock] only through impersonal market transactions." *Chiarella v. United States,* 445 U.S. at 232–33, 100 S.Ct. at 1117.

Since Moss failed to demonstrate that he was owed a duty by any defendant, he has failed to state a claim for damages under section 10(b) or rule 10b–5.

### D. *"Misappropriation" Theory of Disclosure*

■ In addition to arguing that he satisfied the *Chiarella* "duty to disclose" standard, Moss alternatively argues that the district court misread *Chiarella.* He contends that *Chiarella* establishes *only* that "a duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information." 445 U.S. at 235, 100 S.Ct. at 1118. Moss urges us to recognize an exception to *Chiarella* and allow a section 10(b) cause of action against any person who trades on the basis of nonpublic "misappropriated" information.

Both Moss and the SEC premise their "misappropriation" theory on Justice Burger's dissent in *Chiarella:*

> I would read § 10(b) and Rule 10b–5 to encompass and build on this principle: to mean that a person who has misappropriated nonpublic information has an absolute duty to disclose that information or to refrain from trading.

*Id.* at 240, 100 S.Ct. at 1121; *see id.* at 239, 100 S.Ct. at 1120 (Brennan, J., concurring) ("a person violates § 10(b) whenever he improperly obtains or converts to his own benefit nonpublic information which he then uses in connection with the purchase or sale of securities"). In essence, Moss' theory is that any person who "misappropriates" information owes a general duty of disclosure to the entire marketplace. He asserts that this Court's recognition of the "misappropriation theory" is necessary to effectuate the remedial purposes of the securities laws. *See generally Herman & MacLean v. Huddleston,* —— U.S. ——, ——, 103 S.Ct. 683, 686–87, 74 L.Ed.2d 548 (1983).

While we agree that the general purpose of the securities laws is to protect investors, the creation of a new species of "fraud" under section 10(b) would "depart[ ] radically from the established doctrine that duty arises from a specific relationship between two parties . . . [and] should not be undertaken absent some explicit evidence of congressional intent." *Chiarella v. United States,* 445 U.S. at 233, 100 S.Ct. at 1117. In speaking of the origins of the concept of "fraud" as embodied in the federal securities laws, the Supreme Court in *Chiarella* stated that:

> At common law, misrepresentation made for the purpose of inducing reliance upon the false statement is fraudulent. But one who fails to disclose material information prior to the consummation of a transaction commits fraud *only when he is under a duty to do so.*

*Id.* at 227–28, 100 S.Ct. at 1114 (emphasis added).

In effect, plaintiff's "misappropriation" theory would grant him a windfall recovery simply to discourage tortious conduct by securities purchasers. Yet, the Supreme Court has made clear that section 10(b) and rule 10b–5 protect investors against *fraud;* they do not remedy every instance of undesirable conduct involving securities. *Id.* at 232, 100 S.Ct. at 1116; *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 474–77, 97 S.Ct. 1292, 1301–03, 51 L.Ed.2d 480 (1977). As defendants owed no duty of disclosure to plaintiff Moss, they committed no "fraud" in purchasing shares of Deseret stock.

Moreover, the Court has refused to recognize "a general duty between all participants in market transactions to forgo actions based on material, nonpublic information." *Chiarella v. United States,* 445 U.S. at 233, 100 S.Ct. at 1117. Rather, in *Chiarella* the Court stated that:

> [N]either the Congress nor the Commission ever has adopted a parity-of-information rule. . . .
>
> . . . .
>
> . . . *We hold that a duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information.* The contrary result is without support in the legislative history of § 10(b) and would be inconsistent with the careful plan that Congress has enacted for regulation of the securities markets. *Cf. Santa Fe Industries, Inc. v. Green,* 430 U.S. at 479, 97 S.Ct. at 1304.

*Id.* at 233, 235, 100 S.Ct. at 1117, 1118 (emphasis added) (footnotes omitted). We find that plaintiff's "misappropriation" theory clearly contradicts the Supreme Court's holding in both *Chiarella* and *Dirks* and therefore conclude that the complaint fails to state a valid section 10(b) or rule 10b–5 cause of action.

II. *Morgan Stanley's Derivative Liability*

◼ Plaintiff claims that pursuant to section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) (1976), Morgan Stanley is a "controlling person" who should be found derivatively liable for the unlawful securities violations committed by its employees. Section 20(a) provides:

> (a) Every person who, directly or indirectly, controls any person liable under

any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a) (1976). In considering this claim the district court noted initially that "[a]s the claims against the individuals have been dismissed, Morgan Stanley cannot be derivatively liable." 553 F.Supp. at 1356. We agree. Because the section 20(a) claim was correctly dismissed on this threshold ground, we need not review the case law defining section 20(a) derivative liability.

### III. *RICO*

#### A. *Introduction*

In Count II of the amended complaint, plaintiff Moss alleged that defendant Newman's unlawful purchase and sale of Deseret stock constituted a violation of RICO, 18 U.S.C. § 1962(c) (1976), thereby subjecting him to civil liability under 18 U.S.C. § 1964(c) (1976). The district court dismissed plaintiff's RICO claim on the grounds that the complaint failed to include several allegations "essential" to pleading a RICO claim. We affirm the district court's dismissal of the RICO count, but do not endorse the court's reasons for doing so.[10]

#### B. *Threshold Defect in the Complaint*

■ To state a claim for damages under RICO a plaintiff has two pleading burdens. First, he must allege that the defendant has violated the substantive RICO statute, 18 U.S.C. § 1962 (1976), commonly known as "criminal RICO." In so doing, he must allege the existence of seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce. 18 U.S.C. § 1962(a)-(c) (1976). Plaintiff must allege adequately defendant's violation of section 1962 before turning to the second burden—*i.e.*, invoking RICO's civil remedies of treble damages, attorneys fees and costs. *See Bays v. Hunter Savings Association,* 539 F.Supp. 1020, 1023 (S.D.Ohio 1982). To satisfy this latter burden, plaintiff must allege that he was "injured in his business or property *by reason of* a violation of section 1962." 18 U.S.C. § 1964(c) (1976) (emphasis added). Moss' complaint fails to carry either pleading burden.

#### *Section 1962*

■ Plaintiff's complaint fails to allege one of the elements needed to state a violation of section 1962—that defendant Newman engaged in "racketeering activity." Section 1961(5) defines "pattern of racketeering activity" as at least two acts of "racketeering activity" occurring within ten years of each other. 18 U.S.C. § 1961(5) (1976).[11] In turn, section 1961(1)(D) defines "racketeering activity" to include "any offense involving fraud ... in the sale of securities." 18 U.S.C. § 1961(1)(D) (Supp. III 1979).[12] Plaintiff sought to satisfy both the "pattern" and "racketeering" elements

---

10. We recognize that in attempting to delineate the scope of "civil" RICO, the district court did not have the benefit of our decisions in *United States v. Mazzei,* 700 F.2d 85 (2d Cir.1983), *cert. denied,* —— U.S. ——, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983), *United States v. Ivic,* 700 F.2d 51 (2d Cir.1983), and *United States v. Bagaric,* 706 F.2d 42 (2d Cir.1983), as well as the Seventh Circuit's well-reasoned decision in *Schact v. Brown,* 711 F.2d 1343 (7th Cir. 1983).

11. (5) "[P]attern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter [October 15, 1970] and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.

18 U.S.C. § 1961(5) (1976).

12. (1) "Racketeering activity" means (A) any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion,

of RICO by alleging that "[d]efendants' actions as set forth herein in this Complaint constitute at least two acts of fraud in connection with the purchase and sale of securities and as such represent a pattern of racketeering activity within the meaning of RICO." J.App. at 11. Thus, the complaint clearly relies on Newman's allegedly "fraudulent" securities transactions with respect to Deseret stock as the predicate acts of "racketeering" that form the "pattern" underpinning plaintiff's RICO claim. Such allegations of fraud would ordinarily satisfy RICO's "racketeering activity" pleading prerequisite.[13]

However, in section I of this opinion, we held that plaintiff Moss' pleadings had failed *as a matter of law* to state a claim that Newman had *defrauded* him in violation of section 10(b) and rule 10b–5. In affirming the district court's grant of Newman's 12(b)(6) motion to dismiss, we dismissed plaintiff's claim of "securities fraud" from the complaint. In addition, the district court's dismissal of plaintiff's section 14(e), rule 14(e)–3 and common law fraud claims was never appealed. Therefore, since the complaint contains no *valid* allegation of "fraud,"[14] to underpin the "predi-

---

or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891–894 (relating to extortionate credit transactions), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), sections 2314 and 2315 (relating to interstate transportation of stolen property), sections 2341–2346 (relating to trafficking in contraband cigarettes), sections 2421–24 (relating to white slave traffic), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), or (D) *any offense involving* fraud connected with a case under title 11, *fraud in the sale of securities,* or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States.

18 U.S.C. § 1961(1)(D) (Supp. III 1979) (emphasis added).

**13.** Although the district court's opinion voices an extreme reluctance to extend RICO's civil remedies to garden variety securities fraud claims, *see* 553 F.Supp. at 1361, a number of courts have entertained both civil and criminal RICO claims premised on common law fraud and "ordinary" securities fraud violations. For civil cases see, *e.g., USACO Coal Co. v. Carbomin Energy, Inc.,* 689 F.2d 94, 95–96 (6th Cir. 1982); *Mauriber v. Shearson/American Express, Inc.,* 546 F.Supp. 391, 395–96 (S.D.N.Y. 1982); *Harper v. New Japan Securities Int'l,* 545 F.Supp. 1002, 1003 (C.D.Cal.1982); *Maryville Academy v. Loeb Rhoades & Co.,* 530 F.Supp. 1061, 1064–65 (N.D.Ill.1981); *Engl v. Berg,* 511 F.Supp. 1146, 1154 (E.D.Pa.1981); *Landmark Savings & Loan v. Loeb Rhoades, Hornblower & Co.,* 527 F.Supp. 206 (E.D.Mich. 1981); *United States v. DePalma,* 461 F.Supp. 778, 785 (S.D.N.Y.1978); *Farmers Bank v. Bell Mortgage Corp.,* 452 F.Supp. 1278, 1279 (D.Del. 1978); for criminal cases see, *e.g., United States v. Weisman,* 624 F.2d 1118, 1124 (2d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980); *United States v. Pray,* 452 F.Supp. 788, 793 (M.D.Pa.1978).

**14.** Although RICO provides that "fraud in the sale of securities" may constitute "racketeering activity," it supplies neither a definition of "fraud" nor a reference to other federal laws contemplated in drafting this "predicate offense."

The district court did not define "RICO fraud" when it dismissed plaintiff's complaint. Similarly, we need not decide this complex and far-reaching question. Following the district court's rejection of plaintiff's 14(e) and common law fraud claims, we put to rest any lingering existence of "fraud" in the instant complaint by rejecting plaintiff's section 10(b) and rule 10b–5 claims. Therefore, as neither com-

cate acts" of "racketeering," it necessarily must fail.

With respect to the sufficiency of the "racketeering" allegations, the district court's decision in *Mauriber v. Shearson/American Express, Inc.,* 546 F.Supp. 391 (S.D.N.Y.1982), is instructive. There the plaintiff alleged that defendant's mismanagement of a discretionary brokerage account violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1976), and RICO, 18 U.S.C. § 1962(c) (1976). In response to defendant's Rule 12(b)(6) motion the district court found that plaintiff had failed to state its section 10(b) fraud claim with sufficient particularity to meet the pleading requirements of Fed.R.Civ.P. 9(b). The court further concluded that:

> [T]he RICO claim must fail for reasons not advanced by defendants. In Count II, the complaint alleges a violation of RICO by vaguely referring back to all of the preceding paragraphs that constitute the Section 10(b) violation. As earlier stated, the securities fraud allegations fail in numerous respects to comply with the specificity requirements of Fed.R.

Civ.P. 9(b). *Until such time as plaintiff adequately pleads fraud it will not be known whether a RICO violation is properly alleged.* As a result, Count II of the complaint is dismissed with leave to replead within 20 days of the date hereof.

*Id.* at 397 (emphasis added); *accord Maryville Academy v. Loeb Rhoades & Co.,* 530 F.Supp. 1061, 1070 (N.D.Ill.1981) (Court notes that "filing the lawsuits is not fraud in connection with a securities transaction; *thus* the filings are not within the scope of racketeering activity under the RICO statute."); *see also Van Schaick v. Church of Scientology,* 535 F.Supp. 1125, 1138 (D.Mass.1982).

The instant complaint suffers from a defect more fundamental than that found in *Mauriber.* As plaintiff has failed to state a valid claim that defendant Newman's securities transactions were "fraudulent" violations of section 10(b) or rule 10b–5, we cannot now conclude that such acts represent "racketeering activity" sufficient to support his RICO·cause of action. Rather, since our dismissal of the securities fraud claim so undercut the existence of any "racketeering activity" in the complaint,[15]

mon law fraud nor traditional securities fraud underpins plaintiff's RICO claim, we need not delineate RICO's definition of "fraud in the sale of securities."

15. In speaking of plaintiff's RICO claim, the district court apparently believed that "[p]laintiff rests his argument that Newman is liable in treble damages for a violation of RICO on *the mere fact that Newman has been convicted of violating some of the statutes listed in Section 1961.*" 553 F.Supp. at 1363 (emphasis added). Conceivably, Newman's prior convictions for mail fraud, as well as securities fraud (both enumerated as racketeering activities within 18 U.S.C. § 1961(1)), could provide the proof of the predicate acts of "racketeering" that is presently absent from the complaint.

Although the courts have noted that prior convictions for alleged predicate offenses are not preconditions to bringing a RICO civil suit, *see, e.g., USACO Coal Co. v. Carbomin Energy, Inc.,* 689 F.2d 94, 95 n. 1 (6th Cir.1982); *United States v. Malatesta,* 583 F.2d 748, 757 (1978), *aff'd on rehearing,* 590 F.2d 1379 (5th Cir.), *cert. denied,* 444 U.S. 846, 100 S.Ct. 91, 62 L.Ed.2d 59 (1979); *Glusband v. Benjamin,* 530 F.Supp. 240, 241 (S.D.N.Y.1981); *see also State Farm Fire and Casualty Co. v. Estate of Caton,* 540 F.Supp. 673, 675 (N.D.Ind.1982); *Heinold*

*Commodities, Inc. v. McCarty,* 513 F.Supp. 311, 313–14 (N.D.Ill.1979); *Parnes v. Heinold Commodities, Inc.,* 487 F.Supp. 645, 647 (N.D.Ill. 1980); *Farmers Bank v. Bell Mortgage Corp.,* 452 F.Supp. 1278, 1280 (D.Del.1978); *but see Kleiner v. First National Bank,* 526 F.Supp. 1019, 1022 n. 2 (N.D.Ga.1981) ("It may well be that entitlement to the civil remedy of section 1964 should be conditioned upon a criminal conviction or at least an indictment."), a growing number of courts have recognized that a prior criminal conviction on the alleged predicate offense may exert a collateral estoppel effect on the issue of "racketeering activity" in pleading a "civil RICO" claim. *See Municipality of Anchorage v. Hitachi Cable, Ltd.,* 547 F.Supp. 633, 644 (D.Ala.1982) ("Under traditional theories of collateral estoppel, Hitachi's pleas of guilty to the mail and wire fraud counts estop it from denying that it engaged in a pattern of racketeering activity...."); *Anderson v. Janovich,* 543 F.Supp. 1124, 1127–32 (W.D.Wash.1982); *State Farm Fire and Casualty Co. v. Estate of Caton,* 540 F.Supp. at 682–83; *but see United States v. Malatesta,* 583 F.2d at 757 ("Because the United States was not a party in the state proceedings, it is not collaterally estopped from proving in the federal prosecutions [RICO] facts that the state was

we affirm the district court's dismissal of plaintiff's RICO claim.

## C. *District Court Dismissal of RICO*

We now turn to the remaining rationales offered by the district court to support its dismissal of plaintiff's RICO claim. The district court dismissed the RICO claim on the grounds that plaintiff had failed to allege several elements essential to pleading such a claim. Most notably, the court found that the complaint failed to allege (1) the existence of an "enterprise" and that this "enterprise" was economically independent from defendants' "pattern of racketeering activity,"[16] and (2) that the "enterprise," or any of the defendants, had a tie to "organized crime." We do not agree with the district court's assessment that these omissions required dismissal of the complaint.

> unable to prove."). *See generally* Tarlow, *RICO: The New Darling of the Prosecutor's Nursery,* 49 Fordham L.Rev. 165, 266–67 (1980).
> However, we need not examine the collateral estoppel effect of Newman's criminal conviction in this case. Plaintiff's complaint never mentioned the existence of Newman's prior criminal conviction, let alone presented it as proof of "racketeering activities" sufficient to support the RICO claim.

**16.** The district court also required plaintiff to plead a third allegation:

> [P]laintiff's injury to be cognizable under RICO must be caused by a RICO violation and not simply by the commission of a predicate offense .... RICO's civil remedy provision permits a recovery to "any person injured in his business or property *by reason of a violation of Section 1962,*" ... that is, where the distinctive RICO violation contributed to plaintiff's injury, i.e., where the plaintiff suffered directly a racketeering enterprise injury at the hands of those sought to be reached by the Organized Crime Control Act of 1970.
> 553 F.Supp. at 1361.
> In so stating, the district court joined a growing number of courts that have limited standing under 18 U.S.C. § 1964(c) to those "plaintiffs alleging something more, or different, than direct injury resulting from the predicate acts that constitute the racketeering activity. Instead, a plaintiff must allege a commercial or 'racketeering enterprise' injury." *Johnsen v. Rogers,* 551 F.Supp. 281, 284–85 (C.D.Cal.1982)

## 1. *Civil RICO*

The district court's opinion is replete with expressions of concern about the broad scope of civil RICO. The court began its analysis by noting that "[t]he Racketeer Influenced and Corrupt Organizations Act, part of the Organized Crime Control Act of 1970, was designed in a multifaceted campaign against the pervasive presence of organized crime infiltrated in American business and trade," 553 F.Supp. at 1359, and then cautioned that "[t]he statutory language and recent Supreme Court and Second Circuit precedent, if carefully applied, can be extraordinarily effective in limiting RICO to its intended scope and filtering out many RICO claims that are just efforts to claim treble damages for ordinary violations of criminal or tort laws." *Id.* at 1360. The court continued, "The sweep of the statute does not embrace

> (footnote omitted); *see Cenco, Inc. v. Seidman & Seidman,* 686 F.2d 449, 457 (7th Cir.), *cert. denied,* ⸺ U.S. ⸺, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982); *North Barrington Development, Inc. v. Fanslow,* 547 F.Supp. 207, 211 (N.D.Ill. 1980) ("plaintiff must allege how it was injured competitively by the RICO violation in order to state a cause of action under § 1964(c)."); *Harper v. New Japan Securities Int'l,* 545 F.Supp. 1002, 1007 (C.D.Cal.1982); *Van Schaick v. Church of Scientology,* 535 F.Supp. 1125, 1137 (D.Mass.1982); *Landmark Savings & Loan v. Loeb Rhoades, Hornblower & Co.,* 527 F.Supp. 206, 208 (E.D.Mich.1981); *see also* Comment, *Reading the "Enterprise" Element Back into RICO: Sections 1962 and 1964(c),* 76 Nw.U.L. Rev. 100, 125–33 (1981). *But see Bennett v. Berg,* 685 F.2d 1053, 1059 (8th Cir.), *aff'd in part and rev'd in part on other grounds,* 710 F.2d 1361 (8th Cir. 1983) (en banc); *D'Iorio v. Adonizio,* 554 F.Supp. 222, 231 (M.D.Pa.1982); *Hellenic Lines Ltd. v. O'Hearn,* 523 F.Supp. 244, 248 (S.D.N.Y.1981); *see also* Blakey & Gettings, *Racketeer Influenced and Corrupt Organizations (RICO); Basic Concepts—Criminal and Civil Remedies,* 53 Temple L.Q. 1009, 1040–43 (1980); Strafer, Massumi & Skolnick, *Civil RICO in the Public Interest: "Everybody's Darling,"* 19 Am.Crim. L.Rev. 655, 689–707 (1982).
> The district court subscribed to this interpretation of section 1964(c), but never explained its understanding of a racketeering enterprise injury. We need not decide whether such an interpretation is proper because we find that plaintiff has not satisfied the threshold burden of showing that he suffered *any* injury *"by reason of"* defendants' unlawful conduct.

ordinary violators charged in common law fraud actions or federal securities law violations as the predicate offenses for RICO relief," *id.* at 1361, and finally concluded that "there is nothing in the legislative history to suggest that Congress intended to create a private right of action for treble damages for violations of substantive statutes by ordinary business[es] or parties." *Id.* at 1361.

We sympathize with the district court's concerns. However, it is not the "[judiciary's] role to reassess the costs and benefits associated with the creation of a dramatically expansive ... tool for combating organized crime." *Schact v. Brown,* 711 F.2d at 1361 (citing *United States v. Turkette,* 452 U.S. at 586–87, 101 S.Ct. at 2530, 69 L.Ed.2d 246). In this regard we agree with the author of the Note, *Civil RICO: The Temptation and Impropriety of Judicial Restriction,* 95 Harv.L.Rev. 1101, 1120–21 (1982):

> Courts should not be left to impose liability based on their own tacit determination of which defendants are affiliated with organized crime. Nor should they create standing requirements that would preclude liability in many situations in which legislative intent would compel it. Complaints that RICO may effectively federalize common law fraud and erode recent restrictions on claims for securities fraud are better addressed to Congress than to courts.

Although we appreciate the concerns motivating the district court to limit RICO's scope, we believe that the court misinterpreted the elements essential to pleading a RICO cause of action.

### 2. *Organized Crime*

█ The district court stated that "application of RICO should be restricted sharply to organized crime and the enterprises on which its talons have fastened. Thus, courts in the Southern District and elsewhere have held that RICO claims for damages could be maintained only if there was a tie to organized crime." 553 F.Supp. at 1361 (citing *Noonan v. Granville-Smith,* 537 F.Supp. 23, 29 (S.D.N.Y.1981); *Barr v. WUI/TAS, Inc.,* 66 F.R.D. 109, 112–13 (S.D. N.Y.1975); and *Waterman Steamship Corp. v. Avondale Shipyards, Inc.,* 527 F.Supp. 256, 260 (E.D.La.1981)); *accord Wagner v. Bear, Stearns & Co.,* [current] Fed.Sec.L. Rep. (CCH) ¶ 99,032 (N.D.Ill.1982); *City of Atlanta v. Ashland-Warren, Inc.,* 1982–1 Trade Cas. (CCH) ¶ 64,527 (N.D.Ga.1982).

It is true that RICO's legislative history states that it was enacted to provide "enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." Organized Crime Control Act of 1970, Pub.L. No. 91–452, 84 Stat. 922, *reprinted in* 1970 U.S.Code Cong. & Ad.News 1073; *see United States v. Ivic,* 700 F.2d 51, 62 (2d Cir.1983). The language of the statute, however, does not premise a RICO violation on proof or allegations of any connection with organized crime.[17]

### 3. *The "Enterprise" Element*

█ The district court recognized that section 1962(c) requires plaintiffs to plead that an "enterprise" exists and that "there must be some nexus between the pattern of racketeering activity and the enterprise." 553 F.Supp. at 1363. We agree. Section

---

**17.** Similarly, the Act's legislative history supports a rejection of this "organized crime" element. During the House debates on RICO, Congressman Biaggi proposed an amendment that sought to limit the application of RICO to Mafia and La Cosa Nostra organizations. 116 Cong.Rec. 35,343 (1970). The amendment was vigorously attacked on constitutional grounds. Congressman Celler objected that such terms were "imprecise, uncertain, and unclear" and that mere membership in an organization should not be punished. *Id.* at 35,343–44 (1970). Congressman Poff (the bill's sponsor in the House) objected that such an amendment might violate the Supreme Court's rulings that struck down statutes which created status offenses, such as *Scales v. United States,* 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961), and *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). 116 Cong. Rec. 35,344 (1970). Congress rejected the amendment. *Id.* at 35,346; *see* Cornell Institute on Organized Crime, Techniques in the Investigation and Prosecution of Organized Crime 59–105 (G.R. Blakey ed. 1980).

1962(c) states: "It shall be unlawful for any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." 18 U.S.C. § 1962(c) (1976). "Enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (1976); *see United States v. Turkette,* 452 U.S. 576, 581–82, 101 S.Ct. 2524, 2527–28, 69 L.Ed.2d 246 (1981).

Yet, in addition to requiring plaintiff to plead the existence of this "enterprise," the district court required him to allege facts showing that the "enterprise" had an "independent economic significance from the pattern of racketeering activity." 553 F.Supp. at 1363. The district court concluded that because Morgan Stanley's and Newman's alleged "pattern of activity [was] identical to the enterprise ... the plaintiff completely fails to make out this element [enterprise] of a RICO claim." *Id.* This conclusion cannot stand in light of our recent decisions in *United States v. Mazzei,* 700 F.2d 85 (2d Cir.1983), *cert. denied,* —— U.S. ——, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983), and *United States v. Bagaric,* 706 F.2d 42 (2d Cir.1983).

In *United States v. Mazzei* we expressly rejected the Eighth Circuit's view that the evidence offered to prove the "enterprise" and "pattern of racketeering" must necessarily be distinct. *Id.* at 89–90; *see Bennett v. Berg,* 685 F.2d at 1060; *United States v. Anderson,* 626 F.2d 1358, 1372 (8th Cir.1980) (enterprise "to encompass only an association having an ascertainable structure which exists for the purpose of maintaining operations directed toward an economic goal that has an existence that can be defined apart from the commission of the predicate acts constituting the 'pattern of racketeering activity.'"), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981). Instead, we relied on the Supreme Court's decision in *Turkette* that "proof

used to establish the 'pattern of racketeering activity' element 'may in particular cases coalesce' with the proof offered to establish the 'enterprise' element of RICO." *United States v. Mazzei,* 700 F.2d at 89 (quoting *United States v. Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528); *see United States v. Bagaric,* 706 F.2d at 55. In *Mazzei* a group of individuals—bettors and Boston College basketball players—conspired illegally to shave points in Boston College basketball games in order to maximize their gambling proceeds. The "enterprise" consisted of the Boston College conspirators functioning as a "continuing unit, *i.e.,* during the 1978–79 B.C. basketball season" and the "pattern of racketeering activity" consisted of "'fixing' nine B.C. basketball games." 700 F.2d at 89. We upheld the propriety of Mazzei's RICO conviction even though the proof offered to establish the existence of these two elements had "coalesced." *Id.; see United States v. Bagaric,* 706 F.2d at 55 ("We have upheld application of RICO to situations where the enterprise was, in effect, no more than the sum of the predicate racketeering acts.").

In this case the "enterprise" allegedly consisted of Courtois' use of his position at Morgan Stanley to obtain confidential information about imminent tender offers; Antoniu's transmission of tender offer information to Newman; and Newman's use of his brokerage abilities to purchase the "target's" stock. The criminal indictment of these individuals reported that their tender offer "enterprise" existed for approximately two years. J.App. at 60–62. As previously mentioned, the "pattern of racketeering activity" consisted of Newman's purchase and sale of Deseret stock on the basis of the confidential information about the imminent tender offer. We can see no logical or practical basis upon which to distinguish between the enterprise/racketeering relationship of the illegal gamblers in *Mazzei* and the enterprise/racketeering relationship of the securities "schemers" in this case. *See also United States v. Errico,* 635 F.2d 152, 156 (2d Cir.1980) (a network

of jockeys and bettors, who joined together for the single illegal purpose of betting on "fixed" horseraces, constituted an "enterprise" for the purposes of RICO), *cert. denied,* 453 U.S. 911, 101 S.Ct. 3142, 69 L.Ed.2d 994 (1981). We find that under the standard articulated in *Mazzei,* the district court erred in its characterization of RICO's "enterprise" and "pattern of racketeering activity" elements.

*Summary*

We affirm the district court's dismissal of plaintiff's complaint on the grounds that (1) under *Chiarella* and *Dirks* plaintiff's inability to show that any defendant owed him a duty of disclosure precluded a violation of section 10(b) or rule 10b–5; (2) as the individual defendants were not held liable for violating the federal securities laws, Morgan Stanley could not be held derivatively liable under section 20(a) of the 1934 Act; (3) because plaintiff failed to state a claim under section 10(b) of the 1934 Act that defendant Newman committed fraud in the sale of securities, the RICO claim—which premises its "pattern of racketeering activity" on the alleged securities fraud—must likewise fail; and (4) since plaintiff failed to allege that his injury was causally connected to defendant's "unlawful" conduct, his civil RICO claim must be dismissed.

Affirmed.