Janie D'ADDIO, Plaintiff,

v.

L.F. ROTHSCHILD INC. and Wende F. Bankston, Defendants.

No. 88 Civ. 1106 (IBW).

United States District Court, S.D. New York.

Oct. 7, 1988.

## MEMORANDUM OPINION AND ORDER

WYATT, District Judge.

This is a motion by defendant L.F. Rothschild Inc. ("Rothschild" or "movant") for an order dismissing the complaint for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). The complaint contains seven separate counts, each count attempting to state a separate claim. The motion therefore asserts that no sufficient claim is stated in any one of the seven separate counts. I agree with movant and the motion is granted.

### 1.

The action was commenced by the filing of a complaint on February 18, 1988. There were two defendants named, movant and Wende F. Bankston. Plaintiff (sometimes hereafter "Janie") is an individual, alleged to be a California citizen, residing at Newport Beach, California (para. 7). Movant is alleged to be a Delaware corporation having its "principal office" in downtown Manhattan in New York City (para. 8). Presumably this is meant to show the citizenship of the movant corporation, but is meaningless if taken literally because the statute (28 U.S.C. § 1332(c) speaks of "principal place of business," not "principal office." Bankston is alleged (para. 9) to be a New Jersey citizen.

Movant was served with the summons and complaint on February 22, 1988; Bankston was similarly served on May 28, 1988. According to the civil docket entries, Bankston has not appeared, answered, or moved and must be in default; apparently plaintiff has done nothing about the default.

The pending motion was filed on April 21, 1988, and according to my notes was, among other matters, discussed and submitted for decision on May 17, 1988.

### 2.

There appears to be jurisdiction in this Court over the subject matter of the claims attempted to be stated. Jurisdiction rests on a federal question as to some claims (28

Joel S. Forman of Bondy & Schloss, New York City, for plaintiff.

Ann Parry of Gaston & Snow, New York City, for L.F. Rothschild, Inc.

U.S.C. § 1331) and on diversity of citizenship (28 U.S.C. § 1332).

### 3.

The complaint must be examined count by count to determine if any claim is sufficiently stated. The complaint is a very defective pleading because it violates a basic principle of the federal rules. It is not a "short and plain statement" of any claim. Fed.R.Civ.P. 8(a)(2). All of the claims are stated entirely as generalities and conclusions. There is *nothing* in the way of specific facts.

Mere conclusions are alleged as "facts" in, among other places, paras. 10 through 24 and are then repeated as the same basis for seven separate claims, different only as to their seven separate legal theories.

### 4.

The "facts" in paras. 10 through 24 do no more than suggest an entirely vague and indefinite relationship between plaintiff and defendant Rothschild, described (para. 8) as a "securities broker and dealer."

"In or about August 1985" Janie "opened a securities brokerage account" (No. 14–H473) with movant. Janie also had a "special account" (No. 14–H578) with movant. How these accounts were opened, with whom, by whom, whether there was a written or oral agreement for these accounts, what was the difference between the two accounts, who had authority to give orders to buy or sell for these accounts, who in fact did give such orders and when and for what—none of this is stated. It is not stated whether plaintiff gave Rothschild authority to buy and sell for her in the two accounts.

Bankston was employed by movant "and ['as'?] the account executive" for plaintiff. Whether Bankston was male or female (not legally significant, but indicative of a pervasive vagueness), whether known or unknown to Janie, whether located at the New York office of movant or in New Jersey, is not stated.

Bankston was "the account executive assigned" to Janie's "account." What is an "account executive"? What does he or she do? Who assigned him or her? Did Janie select him or her, or approve the selection? To which "account" of the two was Bankston assigned? Nothing is stated in this regard.

Janie was "unsophisticated" and had "virtually no experience in securities" and these "facts" were "well known to defendants." Who knew these "facts"? When were they known? How did they learn such "facts"? What did Janie tell movant about her experience? Nothing is stated in this regard.

Janie closed the account "in or about November 1987." Why did she close the account? Which account did she close? What happened to the other account? With whom did she deal at movant to close the account? Did she receive any final statement of the account closed? Did any money or property change hands when the account was closed? Nothing is stated in this regard.

Before plaintiff opened "the account" (para. 13), "defendants agreed to invest plaintiff's money in a conservative fashion" (para. 13). No distinction is made between the two accounts; the confusion is increased by the explanation (para. 10, fn. 1) that in the complaint the words "the account" are intended to include "the special account." How and when did "defendants" agree? Was the agreement oral or in writing? What were its terms? Who made the agreement? What was the amount of plaintiff's money? To whom was it given? When? In what form? Was any record made? What record? Nothing is said about these (presumably important) matters.

The complaint refers several times to the "investment objectives" of plaintiff (paras. 13, 14(d), 15(b), 17(a)) but these "objectives" are never described nor is it stated that plaintiff ever informed defendants of those "objectives."

There are three long paragraphs which purport to set forth the fraud and false representations by "defendants" to plaintiff. These were "an inducement" for her "to open her account at Rothschild" (para. 14); "during the time that plaintiff's account was traded, defendants engaged in a

continuous and further pattern of misrepresentations" (para. 15); and "defendants fraudulently induced plaintiff ... to ... open an options trading account and ... purchase securities on margin" (para. 16). These representations were further characterized as "blatant and wilful" (para. 17). Not a single specific was given; all was general and conclusory. No person was identified as making any representations; no times, places, nor circumstances are stated.

Some of the averments are on their face bizarre. For example, in para. 15, it is alleged that among the "false statements" made by defendants was that "plaintiff should ignore her monthly statements [from Rothschild] since they were incorrect." Plaintiff would have us believe that Rothschild was telling its customer falsely: "Your monthly statements from us are 'incorrect'; you should ignore them." This is, on its face, hard to believe but, assuming it to be true, plaintiff would not normally accept so absurd a statement but would have demanded some explanation. It is also alleged in para. 15 that, among the "false statements" made by "defendants" was that "funds were wired from plaintiff's account in New York to plaintiff's bank in California." This is again absurd, since plaintiff in California could have easily discovered the falsity of the statement simply by telephoning her "bank in California."

What defendants are claimed to have *done* by way of misconduct is alleged in one paragraph (17) of the complaint. This states that defendants "engaged in a pattern of fraudulent misconduct and gross abuse of the account involving hundreds of separate securities transactions." Not a single transaction in a single security is identified and described. There are merely generalities and conclusions, such as: "took control over the account," "embarked upon a reckless pattern of investments," "churned the account," and the like. In later paragraphs, the averments are even more general and conclusory: such as, transactions "were highly speculative and involved high risk to plaintiff" (para. 22), that defendants "made securities

investments for plaintiff which were unauthorized and otherwise unsuitable for plaintiff" (para. 23), that defendants "traded excessively" (para. 23), and the like. But not a single transaction causing any loss is ever identified.

The complaint is plainly defective as a pleading.

5.

■ Count I is based on the recital of claimed "facts" averred in paras. 10–24. The principal charge is a "churning" of the account in violation of federal law: Section 17(a) of the 1933 Act (15 U.S.C. § 77q(a)) and Section 10(b) of the 1934 Act (15 U.S.C. § 78j(b)).

It is my conclusion that there is no private right of action under Section 17(a) of the 1933 Act. The Second Circuit in *Kirshner v. United States*, 603 F.2d 234 (2d Cir.1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979), upheld such a private right of action, but I venture to predict that the Second Circuit would not follow *Kirshner* if the question were presented today. I realize that there is some difference of opinion as to this among my colleagues on this Court, but I am persuaded by the analysis of Judge Haight in *Ackerman v. Clinical Data, Inc.*, [1985–1986 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,207, at 91,566 (S.D.N.Y.1985) [available on WESTLAW, 1985 WL 1984].

Judge Leval later reached the same result as Judge Haight. *SSH Co. v. Shearson Lehman Bros. Inc.*, 678 F.Supp. 1055, 1058–59 (S.D.N.Y.1987). Judge Leval decided that "no private right of action was implied" in Section 17(a) of the 1933 Act and stated (678 F.Supp. at 1059): "Accordingly, although the *Kirschner* holding lingers, it can no longer be considered good law."

No sufficient claim by this plaintiff is stated under Section 17(a) of the 1933 Act.

Of course, there is a private right of action under Section 10(b) of the 1934 Act. The difficulty here is that, as already noted, there are many averments of fraud in Count I; moreover, there is a charge of "churning" in that count (para. 28), and "a

charge of churning is a charge of fraud" (*Heller v. L.F. Rothschild, Unterberg, Towbin,* 631 F.Supp. 1422, 1424 (S.D.N.Y. 1986)).

■ Fed.R.Civ.P. 9(b) provides in relevant part that in "all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity." The Second Circuit, in considering Rule 9(b), has emphasized that a purpose of this Rule is to assure fair notice of the claim made and the "grounds" therefor. *Ross v. A.H. Robins Co.,* 607 F.2d 545, 557 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). The Court then referred to "an additional important purpose" of this Rule in "the context of securities litigation." 607 F.2d at 557. This "additional important purpose" was thus described by the Second Circuit (607 F.2d at 557):

> It operates to diminish the possibility that " 'a plaintiff with a largely groundless claim [will be able] to simply take up the time of a number of other people [by extensive discovery], with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence....' " *Denny v. Barber, supra,* 576 F.2d [465] at 470 [2d Cir.1978], (quoting *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 741, 95 S.Ct. 1917, 1928, 44 L.Ed.2d 539 (1975)).

The complaint here does not state in Count I any "fraud" with any "particularity." No one can tell from the complaint that there was any transaction or transactions by defendants which constituted "fraud" or "churning"; if there were any such, no names, dates, times, circumstances, or other particulars are stated. The requirements of Fed.R.Civ.P. 9(b) have been disregarded.

With reference to the proper pleading of fraud in a complaint, this Court has stated (*Todd v. Oppenheimer & Co.,* 78 F.R.D. 415, 423 (S.D.N.Y.1978):

> It is apparent ... that the first claim of fraud is based on allegations which can only be described as conclusory.

They identify only vague promises and general categories of investment mismanagement. There is no inclusion of who specifically made the representations, when, where, in what form or the *facts* misrepresented,.... Once these items are pleaded then the plaintiff must plead the fraudulent nature of these statements and the detrimental reliance thereon....

Moreover, beyond the reference to an initial investment of a bank account of $259,000, there has been absolutely no mention of the particular transactions engaged in by *any* party. Thus the defendant and this Court have no basis for any understanding regarding either damages or the various practices which the plaintiffs allege defendants employed in handling her accounts as listed above. This void clearly contravenes the mandate of Rule 9(b). *Segal,* [*v. Gordon*] *supra,* 467 F.2d [602] at 608 [2d Cir.1972] ("the nature and amount of the securities exchanged, ... the dates of the transaction [must be] disclosed"). The plaintiff must plead "the nature and amount of the securities purchased and the specific dates of the transactions." [*Gross v. Diversified Mortgage Investors*] *Gross I, supra,* 431 F.Supp. [1080] at 1088 [S.D. N.Y.1977].

The above observations make it clear that the plaintiffs' complaint violates Rule 9(b). "[M]ere conclusory allegations to the effect that defendant's conduct was fraudulent or in violation of Rule 10b–5 are insufficient." *Shemtob, supra,* [*v. Shearson Hammill & Co., Inc.*] 448 F.2d [442] at 444 [2nd Cir.1971]. A similar conclusion led Judge Lumbard to note, "[a]llegations such as these scarcely inform a defendant what the plaintiff is talking about, let alone satisfy the standards required by rule 9(b)." *Felton* [*v. Walston and Co., Inc.*], *supra,* 508 F.2d [577] at 581 [2nd Cir.1974].

With reference to the proper pleading of "churning" as fraud, one Court has stated (*Polera v. Altorfer, Podesta, Woolard & Co.,* 503 F.Supp. 116, 118–19 (N.D.Ill.1980):

In Count I of his complaint, the plaintiff alleges that the defendants violated Rule 10b–5 of the Exchange Act by "churning" his options account through a series of unsuitable transactions. To adequately plead Rule 10b–5 fraud, a plaintiff must satisfy the particularity requirements of Rule 9(b), Fed.R.Civ.P., ... such requirements having been imposed to insure that the defendants in question will be given notice of the fraud claimed which is sufficient in nature to permit them to frame adequate responsive pleadings.... Accordingly, because a properly pleaded churning claim is cognizable as fraud under federal securities law, ... conclusory allegations cannot, without more, be considered sufficient to support such a claim....

The essence of a churning claim is not a particular trade or group of trades, but rather is the overall amount of trading in the customer's account in light of such considerations as market conditions, size of commissions, and sophistication of the customer.... Because that is so, it would serve no useful purpose to require plaintiffs to list in their pleadings every transaction relevant to their claims.... To satisfy the requirements of Rule 9(b) in a claim for churning in violation of Rule 10b–5, the complaint instead should identify the securities involved and should contain a statement of facts which is sufficient to, at the very least, permit a rough ascertainment of either the turnover ratio or the percentage of the account value paid in commissions....

In Count I of his complaint, the plaintiff's allegations clearly lack the specificity required by Rule 9(b). Without more, his statement therein regarding his initial investment, the number of transactions per year, and the aggregate commission charges per year during the period the defendants exercised control over his account ... does not provide the means of comparison necessary to determine whether his account had been excessively traded.... The information provided in the complaint also is insufficient to permit calculation of the defend-

ants' commissions as a percentage of account equity, on either a monthly or year-to-date basis.

With regard to his claim of unsuitability, the plaintiff alleges only that the defendants traded without consideration of his investment needs or objectives.... To properly plead a claim of this nature, however, the plaintiff must specifically identify the securities transactions at issue, and indicate why they were unsuitable....

Further, with reference to the proper pleading of "churning" as fraud, this Court has more recently (in 1986) said (*Heller v. Rothschild,* above cited, 631 F.Supp. 1422 at 1424–25 (S.D.N.Y.1986)):

It is generally held that "conclusory allegations that defendant's conduct was fraudulent or deceptive are not enough," *Decker v. Massey Ferguson, Ltd.,* 681 F.2d 111, 114 (2d Cir.1982); and that even though the rule requiring particularity in pleading "is relaxed as to matters particularly within the adverse party's knowledge, the allegations must then be accompanied by a statement of the facts upon which the belief [of fraudulent conduct] is founded." *Segal v. Gordon,* 467 F.2d 602, 608 (2d Cir.1972). In a case of alleged churning, the plaintiff "must set forth facts that allow the determination of whether or not trading was excessive." *Moran, [v. Kidder Peabody & Co., Barbers ] supra,* [609 F.Supp.] at [661] 666 [S.D.N.Y.1985]. Discovery in aid of fleshing out a pleading alleging fraud is not favored....

\*    \*    \*    \*    \*    \*

As noted *supra,* the first element of a claim for churning is that the trading in the account was excessive in the light of the plaintiff's investment objectives. Subsumed within this element are the precise instructions given by the investor to the broker, and the responses made by the broker to the investor, upon which the latter claims to rely. Even though it is the broker's declarations and actions which are said to be fraudulent, it is important to know what the investor said to the broker to elicit those responses,

particularly since fraud may consist of omissions as well as affirmative statements. In order that a broker and his employer may adequately comprehend and defend against the charge of fraud, a plaintiff alleging fraud by churning should allege specifically what instructions he gave to the broker or other representative of the corporate defendant; to whom those instructions were given; on what dates they were conveyed; and whether they were oral, in writing, or both. The plaintiff in such an action should allege, with comparable particularity, what his own investment experience was, and what information he conveyed on that subject to the broker, with comparable detail.

Secondly, the plaintiff should allege with comparable particularity the responses or assurances made by the broker or on behalf of the brokerage house which plaintiff alleges were fraudulent.

The second element relates to whether or not the broker exercised control over the account. Most frequently, this involves whether or not the broker had discretionary control over the investor's account. If that is the fact, the investor must specifically allege it to be so.

\* \* \* \* \* \*

The present complaint alleges plaintiff's lack of sophistication in general terms (¶ 7). While ¶ 48 of the complaint refers to pre-purchase conversations between plaintiff and defendant Rice on at least some occasions, the concept of "effective control of the account" is alleged in conclusory terms. Plaintiff must allege specifically whether or not this was a discretionary account; and, if it was not, defendants are entitled to a more particular series of allegations on the element of control.

Based on the "deficiencies" noted in the quotation above, this Court directed dismissal of the pleading "for failure to conform with Rule 9(b)."

The claim in Count I of the complaint at bar must similarly be dismissed as insufficient because of a failure to conform with Rule 9(b).

### 6.

■ Count II of the complaint attempts to state a civil claim for treble damages under 18 U.S.C. § 1964(c), a section of RICO, 18 U.S.C. §§ 1961 and following.

A decision of our Court of Appeals is instructive as to this Count. *Moss v. Morgan Stanley Inc.*, 719 F.2d 5 (2d Cir.1983) (hereafter *Moss*), *cert. denied sub nom. Moss v. Newman*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). The opinion by Judge Meskill makes clear that the first pleading burden of a civil RICO plaintiff is to state sufficiently a violation by defendants of a criminal RICO provision in 18 U.S.C. § 1962. To carry this burden, it is declared in *Moss* (719 F.2d at 17) that the pleader

must allege the existence of seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce.

If the pleader carries this first burden, then there is a second burden essential for a claim to the RICO civil remedies of treble damages, etc. "To satisfy this [second] burden, plaintiff must allege that he was 'injured in his business or property *by reason of* a violation of section 1962.' " (*Moss*, 719 F.2d at 17; emphasis added by the Court of Appeals.)

In the case at bar, the plaintiff has failed completely to carry either of her two pleading burdens.

The "facts" alleged in support of Count II are the same paras. 10–24 considered as to the claim in Count I of securities fraud in violation of Section 10(b) of the 1934 Act. In addition to a repeated claim of "securities fraud" in Count II (para. 40), there is a claim in Count II of "mail and wire fraud" (para. 40). If these criminal offenses were sufficiently alleged in Count II, one element of a RICO civil claim would be shown: "racketeering activity" as defined in 18 U.S.C. § 1961(1) (Supp. IV 1986).

But the claims based on "securities fraud" and "mail and wire fraud" in Count II are not sufficiently alleged for the same reason as in Count I: these are only conclusions and generalities whereas "the circumstances constituting fraud" must be stated in the complaint "with particularity." Fed. R.Civ.P. 9(b). As in *Moss*, "dismissal of the securities fraud claim" requires dismissal of the RICO claim because it "undercut the existence of any 'racketeering activity' in the complaint" (719 F.2d at 19).

There are further glaring deficiencies in Count II as a pleading. To show a "pattern of racketeering activity" it must be alleged, under 18 U.S.C. § 1961(5), that "at least two acts of racketeering activity" occurred. There is no averment that *any* act of racketeering occurred. There are averments that each "separate trade or transaction which occurred in plaintiff's account" were "indictable acts" (paras. 41, 42). There is an averment that the "acts of defendants as described in this complaint ... constitute a pattern of racketeering activity" (para. 43). But these are mere repetitions of the words of the statute and are conclusory and general; it is impossible to tell from them how many "acts of racketeering activity" occurred, or what they were, or when they occurred, or what securities were bought or sold, or what, if any, injury to the business or property of plaintiff was caused thereby. Nothing whatever is stated as to these matters.

Not only is there no statement of the number of acts of racketeering activity, but there is no statement of any *facts* to show that there was any "pattern" of such activity. The words of the statute are simply twice repeated (paras. 40, 43). To show how much more than the words of the statute is required to allege a "pattern," it may be useful to quote the famous footnote 14 to the opinion of Justice White in *Sedima v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985; emphasis in the original):

> As many commentators have pointed out, the definition of a "pattern of racketeering activity" differs from the other provisions in § 1961 in that it states that a pattern *"requires* at least two acts of

racketeering activity," § 1961(5) (emphasis added), not that it "means" two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." S.Rep. No. 91–617, p. 158 (1969) (emphasis added). Similarly, the sponsor of the Senate bill, after quoting this portion of the Report, pointed out to his colleagues that "[t]he term 'pattern' itself requires the showing of a relationship.... So, therefore, proof of two acts of racketeering activity, without more, does not establish a pattern...." 116 Cong.Rec. 18940 (1970). (statement of Sen. McClellan). See also *id.*, at 35193 (statement of Rep. Poff) (RICO "not aimed at the isolated offender"); House Hearings, at 665. Significantly, in defining "pattern" in a later provision of the same bill, Congress was more enlightening: "[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 18 U.S.C. § 3575(e). This language may be useful in interpreting other sections of the Act.

In the most recent civil RICO decision of the Second Circuit we have found (*Beauford v. Helmsley*, 843 F.2d 103 (2d Cir. March 31, 1988), a distinguished panel stated that "courts generally, and courts in the Second Circuit in particular, remain confused (and certainly confusing) in their construction of the statutes governing ... civil RICO ...," 843 F.2d at 104, that there have been on this subject "conflicting deci-

sions from other circuits and considerable conflict among the district courts in this Circuit," 843 F.2d at 107, that the "road" taken by the Second Circuit Court of Appeals "thus far is at least as confusing as the divergent paths taken by other federal courts," 843 F.2d at 108, that it had been "demonstrated" that "since Ianniello [*United States v. Ianniello*, 808 F.2d 184 (2d Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 3230, 97 L.Ed.2d 736 (1987)] the district judges in the [Second] Circuit are in even greater disagreement than before," 843 F.2d at 109, and that although the panel reached a decision to affirm dismissal of a civil RICO complaint, "we agree that this case should be reheard en banc to clarify Second Circuit law." 843 F.2d at 110. The next day an en banc hearing was granted, that hearing took place June 13, 1988, and the en banc decision is still pending.

In this state of affairs, I can only follow the plain words of the statute (18 U.S.C. § 1962(c)) and find that a civil RICO claim must aver facts showing "a pattern of racketeering activity." According to the Supreme Court in *Sedima* footnote 14, "two isolated acts of racketeering activity do not constitute a pattern." There must be more; there must be "continuity plus relationship." These essential additional factors, which must be alleged to state a "pattern" for a civil RICO remedy, have been explained by Judge Cummings in *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir.1986):

> In order to be sufficiently continuous to constitute a pattern of racketeering activity, the predicate acts must be ongoing over an identified period of time so that they can fairly be viewed as constituting separate transactions, *i.e.*, "transactions 'somewhat separated in time and place.'" *Graham v. Slaughter*, 624 F.Supp. 222, 225 (N.D.Ill.1985) (quoting *United States v. Moeller*, 402 F.Supp. 49, 57–58 (D.Conn.1975) [ (Newman, J.) ] ).... Relevant factors include the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of

separate schemes and the occurrence of distinct injuries.

The complaint at bar states nothing to show a "pattern of racketeering activity"; there are merely the conclusory words of the statute itself.

Finally, it is essential that plaintiff state in her complaint how and to what extent she was "injured in [her] business or property by reason of a violation" by Rothschild of RICO. There is not the slightest attempt to comply with this requirement. No transaction is identified. No money loss has been stated. No money nor property is stated ever to have been delivered by plaintiff to movant. There is no statement of the result of any transaction, and there could be no such statement because no transaction is stated.

Count II fails to state a claim upon which relief can be granted.

7.

■ Count III is called "Common Law Fraud and Deceit."

Consistent with the generalized approach of the plaintiff with respect to all counts, she simply here incorporates by reference *all* paragraphs preceding Count III and adds general and conclusory averments believed to fit the theory of "common law fraud and deceit" in Count III. While Count III is based on New York common law and diversity jurisdiction, the pleading requirement of Fed.R.Civ.P. 9(b) is applicable to this action in a federal court. *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir. 1985); 2A J. Moore, Moore's Federal Practice ¶ 9.03[1], p. 9–19 (2d ed. 1987).

Since nothing new has been alleged in Count III and since the averments of fraud and deceit have been found in respect of Count I not to comply with Fed.R.Civ.P. 9(b), it must be found that Count III fails to state a claim upon which relief can be granted.

8.

■ Count IV is called "Breach of Fiduciary Duty." The pattern of statement is the same. All preceding paragraphs of the complaint are incorporated in violation of the pleading rules, since many of the ele-

ments appropriate, for example, to the preceding statutory claim under RICO or the 1934 Act, have nothing whatever to do with a simple, equity, non-statutory claim. Simply to reallege the complaint and then, without adding any statement of any facts, to declare that "defendants were fiduciaries to plaintiff" (para. 52), means nothing. It is impossible from the complaint to find any description of the relationship between her and the defendants. All that appears is that she "opened a securities brokerage account" and "had a 'special account.'" (para. 10 and fn. 1 thereto). As pointed out earlier, nothing is ever stated as to the nature of the two accounts. To declare merely that "defendants were fiduciaries" is no sufficient statement of an equity relationship. It is interesting to note that in the lengthy (23 pages) memorandum of law for plaintiff there is no mention of Count IV and the word "fiduciary" never appears.

Count IV fails to state a claim upon which relief can be granted.

9.

■ Count V is called "Securities Fraud —New York General Business Law." This is a further repetition and duplication of the charge of "fraud" in the preceding claims, the conclusory words being again employed.

There is the usual incorporation in this Count V of *all* the preceding paragraphs. Nothing new is stated; there is merely the statement of a legal conclusion: the "agreement [of plaintiff] to open an account with Rothschild constituted an investment contract within the meaning of the New York General Business Law" (para. 57). The *part* of the New York General Business Law on which Count V is based is further identified as "New York General Business Law, Article 21–A" (para. 58).

In their Supporting Memorandum (pp. 37, 38) counsel for movant introduced an element of confusion by describing the claim attempted to be stated in Count V as "claims under New York's Martin Act."

There is but *one* claim attempted to be stated in Count V and that is based on "the offer or sale of a security by means of untrue statements … in violation of the New York General Business Law, Article 21–A" (para. 58).

It is also an error, in my view, for counsel to assert that Section 339–a (in Article 21–A) is "another section of the Martin Act" (Supporting Memorandum, p. 37). As I understand it, Article 21–A is *not* a part of the Martin Act—indeed, has nothing to do with the Martin Act. Article 23–A of the New York General Business Law (Sections 352–359h) is the Martin Act.

Counsel *to plaintiff compound the confusion* when, in their Opposing Memorandum of Law (pp. 21, 22), they insist that Count V states "a sufficient cause of action under the Martin Act" (p. 21) and that Count V is based on Sections 339–a and 339–f of Article 21–A of the General Business Law (pp. 21, 22); they evidently believe also that Article 21–A is a part of the Martin Act.

The Martin Act is set out as Article 23–A in one of the two volumes of McKinney's Consolidated Laws of New York containing the "General Business Law." A "Practice Commentary" by experts in the securities law field, with a legislative history, is included with the text of Article 23–A. The Commentary (p. 5 of the McKinney volume) begins with this statement:

> Article 23–A of the General Business Law, commonly referred to as the "Martin Act" (after its Assemblyman-sponsor) is a statute of enormous breadth and unique dimensions.

The Commentary in McKinney's (p. 6) explains:

> The Martin Act, Article 23–A of the General Business Law, provides the regulatory framework governing the offer and sale of securities and commodities in and from New York.

The legislative history in the Commentary shows (pp. 7, 8) that the Martin Act was part of the pattern of state "blue sky laws" designed to curtail the evils of stock frauds and schemes with no more basis than "so many feet of blue sky." By 1925, all the states ("save two") had such laws.

A commission appointed by Governor Smith recommended such a law for New

York in 1920. "What resulted was the Martin Act [enacted in 1921], introduced by Assemblyman Martin in 1921" (Commentary, p. 8).

The Commentary notes (p. 8) that the Martin Act "has undergone considerable change"; and that a "significant addition was the 1955 enactment of Martin Act § 352–c." The New York Court of Appeals has referred to the Martin Act as "New York's version of the blue sky laws." *CPC Int'l Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 276, 519 N.Y.S.2d 804, 514 N.E.2d 116 (1987; hereafter *"CPC Int'l"*).

In *CPC Int'l*, a 4–2 majority of the New York Court of Appeals held that "an implied private action is not consistent with the legislative scheme underlying the Martin Act," 70 N.Y.2d at 277, 519 N.Y.S.2d 804, 514 N.E.2d 116, and affirmed the dismissal of a claim in a private action based on a violation of Section 352–c of the General Business Law (part of the Martin Act).

Plaintiff insists that her claim in Count V is under Section 339–a and 339–f of Article 21–A of the General Business Law of New York (Opposing Memorandum, pp. 21, 22). Whether the views of all counsel that the cited sections are part of the Martin Act be mistaken or not (and I am satisfied that they are mistaken), the Court is prepared to assume that a private claim can be made under those sections in a civil action.

The defect in Count V is that no claim is sufficiently stated under those sections of Article 21–A. It would appear that the pleader was not even attempting to state any claim under those sections or any other section of Article 21–A.

Count V avers that an agreement by plaintiff "to open an account" with movant "constituted an investment contract within the meaning of the New York General Business Law" (para. 57). There is no reference to "investment contract" in Article 21–A. The only reference to "investment contract" in the General Business Law, so far as our research reveals, is in Section 554, a part of Article 29–D. Section 554 permits under some circumstances the retention "without civil or other liability" of a "counterfeit, forged or spurious instrument or document for the purpose of preserving the same...." There seems no possible connection between such a law and any claim plaintiff may be attempting to state under Article 21–A.

Count V, according to the Opposing Memorandum (pp. 21, 22) for plaintiff, is based on Section 339–a of Article 21–A. That section reads:

> § 339–a. False statement or advertisement as to securities
>
> Any person, who, with intent to deceive, makes, issues or publishes, or causes to be made, issued or published, any statement or advertisement as to the value or as to facts affecting the value of the stocks, bonds or other evidences of debt of a corporation, company or association, or as to the financial condition or facts affecting the financial condition of any corporation, company or association which has issued, is issuing or is about to issue stocks, bonds or other evidences of debt, and who knows, or has reasonable ground to believe that any material representation, prediction or promise made in such statement or advertisement is false, is guilty of a misdemeanor.

There is no indication in Count V of any intention to state a claim under this section. There is no use of the statutory wording. There is no averment of an "intent to deceive," or of "any statement" which was

> made, issued or published ... as to the value or as to facts affecting the value of the stocks, bonds or other evidences of debt of a corporation ... or as to the financial condition ... of any corporation ... which has issued ... or is about to issue stocks, bonds or other evidences of debt....

Not even the name of any "corporation" is stated. Moreover, the language used in Count V is not that of any element of the statutory misdemeanor. For example, it is averred that the "conduct of defendants ... relate to the offer or sale of a security ..."; no such averment is required by Section 339–a.

Count V, according to the Opposing Memorandum for plaintiff (p. 22), is also

based on Section 339–f of Article 21–A. That section reads:

> § 339–f. Delivery to customers of memoranda of transactions by brokers
>
> A person engaged in the business of purchasing or selling as broker stocks, bonds and other evidences of debt of corporations, companies or associations shall deliver to each customer on whose behalf a purchase or sale of such securities is made by him a statement or memorandum of such purchase or sale, a description of the securities purchased or sold, the name of the person, firm or corporation from whom such securities were purchased, or to which the same were sold, and the day, and the hours between which the transaction took place. A broker who refuses to deliver such statement or memorandum to a customer within twenty-four hours after a written demand therefor, or who delivers a statement or memorandum which is false in any material respect, is guilty of a misdemeanor.

There is nothing in Count V to indicate any intention to plead a claim under this section. There is no averment that plaintiff ever made a "written demand" for a "statement or memorandum" of any "purchase or sale" of "securities" made by movant "on [her] behalf." There is no averment that a "statement or memorandum" was delivered to her in respect of a "purchase or sale" of a security and which "statement or memorandum" was "false in [a] material respect." Were there such an averment, a sufficient statement would require that the purchase or sale be described, what was bought or sold, when the purchase or sale took place, wherein it was false, what loss, if any, was suffered by plaintiff, and how such loss was caused by the falsity of the "statement or memorandum." Nothing whatever is alleged in these respects.

Count V fails to state a claim upon which relief can be granted.

### 10.

▮ Count VI has the label: "Wilful and Intentional Tortious Misconduct."

Aside from the usual repetition of every preceding paragraph in the complaint (para. 60), the only averment to support Count VI (para. 61) is: "Defendants' conduct constitutes a wilfull [so in the original], wanton and reckless disregard of the rights of plaintiff, and wilfull [so in the original] and wanton tortious misconduct." This last averment is the mere use of strong adjectives to state the conclusions and opinions of the pleader and nothing whatever to show on what, if anything, those conclusions and opinions are based. It is evident that Count VI states no sufficient claim. It is a total failure to comply with the requirement in this Court that the complaint show "that the pleader is entitled to relief." Fed.R.Civ.P. 8(a).

It appears from the Opposing Memorandum of plaintiff (pp. 22, 23) that counsel for plaintiff are under the mistaken impression that they have pleaded "the elements under New York law for prima facie tort" (p. 22). Apparently counsel for plaintiff, in drawing the complaint, did not know what they were pleading in Count VI but accepted the suggestion in the movant's Supporting Memorandum (pp. 41, 42) that they had tried to plead a "prima facie tort" under New York law.

There is a common law cause of action in New York for "prima facie tort," the "four elements" of which are set forth by the New York Court of Appeals in *Curiano v. Suozzi*, 63 N.Y.2d 113, 117, 480 N.Y.S.2d 466, 469 N.E.2d 1324 (1984) as follows:

> (1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, (4) by an act or series of acts that would otherwise be lawful.

There is not even an attempt to show any "special damages" in the complaint, nor even any averment that there were any, nor any averment of this element in the words of the New York Court of Appeals, nor any use of any word of any of the four elements established by that Court of Appeals.

Count VI is insufficient to plead any claim.

### 11.

Count VII has the label: "Negligence."

The familiar pattern is repeated. Every preceding paragraph of the complaint is incorporated in Count VII (para. 63). The only new averment to support Count VII is the short opinion or conclusion of the pleader (para. 64) that the "conduct of defendants described in this complaint [the sixty-three preceding paragraphs] constitutes negligence."

There is no showing whatever, nor any attempt to make a showing, that "the pleader is entitled to relief" on the ground of negligence.

Claim VII will be dismissed as insufficient.

The motion is granted and under Fed.R. Civ.P. 54(b) and upon an express determination that there is no just reason for delay, the Clerk is directed to enter judgment in the action in favor of defendant L.F. Rothschild Inc. dismissing the action, and each and every claim in the complaint.

SO ORDERED.